Case number 12-2333, People v. Saber-Daheya. Okay, would the lawyers who are going to argue the case please approach the bench and introduce yourself. Good morning. Assistant State's Attorney Susanna Buccaro on behalf of the People. Good morning, Your Honors. Scott Maine on behalf of Saber-Daheya. Okay. And, Pellin, how much time are you going to reserve for rebuttal? Just a couple minutes. Okay. Let's see if we can close that door over there. Good morning again, Your Honors. My name is Scott Maine, and I'm appearing on behalf of Saber-Daheya. The testimony of a single eyewitness, if positive and credible, is sufficient to sustain the State's burden to prove a defendant guilty beyond a reasonable doubt. The problem we have in this case is that we are lacking that one positive, credible witness. The State called four eyewitnesses at trial, three of whom were in the van that Daheya allegedly shot at, and one who witnessed the incident from the park, who the State now refers to as an unabashed liar. Obviously, then, what this Court is tasked to do is to evaluate the testimony of those who were in the van. But like a Seurat painting, the closer you look at their testimony, the less you will see. Who determines whether a person is a credible witness? Obviously, the trial court, sitting as the finder of fact in this case. I mean, they look at the demeanor and the weight. They give certain weight to the evidence. Absolutely, Your Honor. But that does not relieve this Court of its duty to evaluate that same testimony. We're asking you to look at it. Well, when you say evaluate the same testimony, are you telling me that we have the right to decide the credibility of a witness? Well, this Court has to give deference to the credibility determinations. But, again, the case law is replete with instances in which what this Court is tasked to do is to not simply act as a rubber stamp to the credibility determinations that were done by the trial court. This Court is not here just to affirm. If that were the case, then a reasonable doubt argument could never be successful on appeal, and that's simply not true. However, what we do know is that this Court can look at these credibility determinations. Then they still have to ask themselves, were they reasonable? And in this case, frankly, it's unreasonable to simply give deference to these determinations. Well, show me how it's unreasonable here. Well, I think the first thing to think about is that this is a court that was already sort of struggling with the evidence as it was presented. The court found the defendant not guilty of the three counts of attempt murder. And then based on this same incident, the same act of pointing a gun in a van and allegedly firing four times, found him guilty of shooting in the direction of that van. It's simply incredible. It's unreasonable. It's contrary to human experience that someone standing 10 to 12 feet behind a car, shooting directly at that car, and according to these witnesses' testimony, he was aiming directly at them, that there would be no damage to that car. And leaving that aside, saying that... But they said the gun misfired when he tried to shoot it the first time, didn't they? When he first aimed, apparently there was... It wasn't the best gun in the world. But last I checked, the gun still has a decent enough trajectory that it's aiming, the bullet is going to go in the direction in which the gun is fired. And this was a man who was charged with the specific intent of attempting to kill someone, which meant pointing a gun and aiming it at someone, and he was acquitted of that. But he was also charged at aiming in the direction of a van. That van wasn't hit. He was charged at aiming... But does it necessarily follow that if he was acquitted of the greater charge which required specific intent to kill, that he's not guilty of firing the gun? Well, there's a couple of different... It's certainly a different mental state. Obviously, yes. But there are a couple of different points to think about there. First and foremost, there would be the question of simply firing a gun might be a different offense entirely. That might be a reckless discharge. That could be aggravated assault. These offenses, while it didn't require the specific mental state of a specific intent to kill, did still require the court to find that he aimed in the direction of the van or of the individual occupants of the van. And so while it's not inconsistent to say that perhaps the specific intent to kill was lacking, the act is still the same under both findings. And that's why when getting back to Your Honor's initial question in terms of simply giving deference or what are the credibility determinations that this court should be concerned with, that's one that troubles us. And another point that troubles us in terms of what this court is doing is that it's discrediting certain aspects of inconsistencies as being unimportant but crediting other aspects of that testimony as being positive and credible. For instance, you have the two occupants, the driver and the passenger in the van, testified consistently and clearly that Zay Russell was present with the defendant at the time of the offense. The parties then stipulated that Zay Russell was in custody at the time of the offense. So these same witnesses who were positive and were certain in their identification of the defendant as the shooter were also certain of the presence of someone at the crime who was in police custody. They also were positive and certain of the presence of Christian Ramos, who came into court and testified that he was in school at the time. The judge didn't believe that either. The judge did not believe that. And, again, this is why this court simply doesn't have to defer to the determinations made by the trial court. Again, reasonable people on occasion do act unreasonably. And so this would be a situation where we're concerned that some of these same findings made by this same judge were unreasonable given the totality of the circumstances. And obviously we are here raising this claim and accepting the fact that you have to look at the evidence in the lightmost area of the state, but you still have a duty to consider whether or not you're still certain that this evidence sustains what the state's burden is in this case. And there's a final piece. So we have one of the aspects that the judge paid no attention to or sort of brushed aside with this notion of the gang motivation. And this was a serious, obviously major thrust of the defense's case, that these were an 18-year-old and a 19-year-old in the van, both the day after admitting their affiliation with a certain gang, the Simon City Royals. And Padilla specifically saying she was nervous that night because of an ongoing feud going on between the Simon City Royals and the conservative vice lords. And their claim that De Gea was a member of the conservative vice lords and that that was the motivation for the shooting, but that's at that same time is the motivation why we should look with some credulity at the testimony given by Padilla. Padilla is the story that dictates this case. She is the one announcing in the van who's got the gun. She is the one speaking to the police that night. And again, in one of those sort of unusual facts of this case, one of those things that just doesn't sit right when you look at it, when the police are interviewing these eyewitnesses at the scene, they have them all together. And they have them all together, and Padilla does all the talking. The 14-year-old who this trial court found to be the most credible witness didn't identify the defendant that night. She was simply present while Padilla was doing all the talking and indicating that Saber was the one who shot the gun at them. These police were on the scene minutes after the shooting. Minutes after the shooting, they couldn't find anyone else in that park who could step forward and provide positive, credible testimony. These police were on the scene minutes after the shooting and couldn't find any damage to the surrounding area or to the van in which this alleged firing occurred. There are deep, deep questions that come out from this case that simply don't sustain what the state is required to prove when they're being asked whether or not this individual fired in the direction of the van. If there are no other questions, Ron, we'll say good-bye. So you told us how you feel about Padilla, but talk to us about Corna. And how is it that Corna, who's not painted in the same light, is somehow to be disregarded or at least not considered to be corroborative of the others? Well, Corna is directly corroborative of the others, but she's corroborative of the tainted testimony that we're getting from the others. She is 14 years old. She is in the car with two known affiliated gang members who are putting a gang case, they're putting this case, they're saying that Saber did it. She's sitting in the back seat while Padilla in the front seat is saying Saber did it. We have a 14-year-old. There's a huge age difference between her and the other people in that car. And she is scared, and she is ducking down her head. And so in terms of the proof that the state is required to show that the defendant is aiming in the direction of the car and firing in the direction of the car, she ultimately isn't going to provide that link if we accept that the testimony of Padilla and of Fox is unreasonable. She can't provide that extra link. She can provide testimony that basically simply is lockstep with what she heard from Padilla, first in the car. Well, that's an interesting theory, but the question before us is, was the trial court's determination that Corna was a credible witness, is that unreasonable? I frankly believe it was. I mean, just because the witness is 14 years old, without any other impeachment or bias, we're supposed to say it's unreasonable for an experienced trial judge to accept that testimony? I believe in this situation it was unreasonable for the trial court to simply accept her testimony without looking into the motivations behind why that testimony might have appeared the way it did. It was obviously, there's something unsettling about her being seen as this independent actor who while she admits to affiliating with members of the same gang, is somehow removed from that and from that bias and that same motivation to lie. But again, the more troubling factor to me is that she's never providing her own independent account. She's never being asked, she's never being interviewed by the police at the scene individually about what happened. She is standing there while Padilla is saying Saber did this, and then Padilla getting her Facebook page and showing and giving the police the defendant's full name. She that night didn't say to the police who did it. She gave her contact information and she listened while Padilla said who did it. So I feel in this case, her testimony forever was then locked in on what she was being told by Padilla, the 18-year-old gang member or gang-affiliated individual sitting in the front seat along with the driver, also gang-affiliated on that night. Or removing themselves from the gang, but again still claiming the next day that they were affiliated or he at least, Fox was at least, still claiming an affiliation with that same gang, providing that exact testimony. Let me ask you this, were shots fired? It's our contention we simply don't know what happened that night. If shots were fired, this was a crowded park on a summer evening, where's the other witness? Where are the people in the park coming forward? How about the shells? Doesn't that show shots were fired? Shots were fired at some point from a 380-millimeter gun and were obviously found there on that corner. I think that obviously can be corroborative of shots being fired, but can that be corroborative of shots being fired by the defendant when we have no positive credible testimony linking the defendant to the shooting of that gun? Where's the gun? But you first said you have no evidence of shots being fired. The shots were fired.  There are different steps that this Court has taken. You kind of lose your credibility when there are shells and you say that there's no shots fired. I'm willing to accept that. Those shells obviously came from a gun when a gun was fired. Who fired the gun? Unless the Tooth Fairy put them there. It's always possible. I'm unaware of that version of the Tooth Fairy history, but what I am aware of is that obviously the shells are there because shots were fired by some gun at some point. Those shells came from the same gun. But when you look at the rest of that physical evidence, what you're going to get is a parade of no's. There was no fingerprints. There was no gun recovered. There was no GSR introduced. I mean, this was not, and this was, you know, the responding officer was collecting this physical evidence. There wasn't a forensic investigator brought out to the scene to photograph these shells. His supervisor merely said, pick them up. He picked them up, inventoried them, and that's what we're left with to try to connect this individual to a Class I felony. I mean, that's a very serious jump. Obviously we have testimony that is suspect, and we think that that same suspect testimony flowed to the 14-year-old who was listening to everything Padilla was saying. While you're running out of time, you want to keep some time for rebuttal. Right, absolutely, Your Honor. For these reasons, we ask you to reverse his conviction for aggravated discharge of a firearm. Thank you. May it please the Court. Assistant State's Attorney, Susanna Buccaro, on behalf of the people. Your Honors, applying the Jackson Standard, there is no question that any rational trier of fact could have found defendant guilty beyond a reasonable doubt. The evidence in this case was more than sufficient to convict him. First, three eyewitnesses identified defendant as the person they saw holding a gun and pointing it in their direction. Second, there was physical evidence recovered from the scene which corroborated the testimony of these witnesses. And third, defendant fled immediately prior to his arrest, thereby providing circumstantial evidence of his guilt. In light of this, the people respectfully request that this Court uphold the decision of the trial court and affirm defendant's conviction for aggravated discharge of a firearm. The Illinois Supreme Court has long recognized that the single identification of a credible eyewitness is sufficient to sustain a conviction. And here we have the testimony, not of a single witness, but of three credible eyewitnesses. Amanda Padilla testified that on June 14, 2011, she was riding in the front passenger seat of Jermaine Fox's grandfather's tan minivan. As they approached the intersection of Lawndale and Wilson, she looks to her right out the front passenger window, which is open, and she sees someone that she recognizes. She sees the defendant, whom she has known for over two years. She attended Roosevelt High School with this defendant. She knew him from the park. At one point in her life, she testified that she would see him two to three times a week. This is something that defendant overlooks in his appellate argument today. This is a person that she knew, that she had known. He was not a stranger. He was a familiar face. She sees him running towards the van, holding his waistband. He pulls out a weapon. He fumbles with it. He fires four shots in her direction. That is her testimony, and her testimony alone establishes each of the elements of the offense. In addition, Jermaine Fox corroborates her testimony significantly. He, too, knows defendant, knows him from the neighborhood, knows him from Albany and Jensen Park. In fact, Jermaine Fox had played basketball at this park with this exact defendant. They've known each other for over a year and a half. Again, this is a familiar face. This is someone that he knows. He, too, testifies. He looks out the window. He sees defendant. He sees defendant fire multiple shots in his direction. Then there's Ndeye Korne, who the trial court called, quote, a phenomenal witness, and better than any of the witnesses it had seen testify. She, too, corroborates the testimony of Padilla and Fox. As the car approaches Wilson and Lawndale, she hears Padilla say, look, or go, he's got a gun. She looks out the window. She sees defendant, whom she does not know, but whom she recognizes from the neighborhood. She ducks down. She hears multiple shots fired. The Illinois Supreme Court has held in People v. Collins that the credibility of the witnesses and the weight to be given their testimony falls exclusively within the province of the trier effect. And here, the trier effect resolves all credibility determinations in favor of the people, specifically finding Padilla, Fox, and Korne to be credible. Furthermore, there was physical evidence recovered from the scene, which corroborated the testimony of these witnesses. Officer John Geisbusch testified that when he arrived on the scene less than 20 minutes later, he spoke with Amanda Padilla and went to the exact location Amanda Padilla directed him, and in that location where Amanda Padilla said she saw this defendant firing shots, he recovered four spent shell casings. Those shell casings were later inventoried, and a stipulation was entered at trial that they were all fired from the exact same weapon. And finally, defendant fled immediately prior to his arrest, providing additional circumstantial evidence of his guilt. Officer Rogas testified that the day after the shooting, he received a report indicating the defendant was a suspect. Officer Rogas knew defendant from the neighborhood, and so he went to an area where defendant was prone to hang out. As he approached that area, he saw defendant and his friend standing alongside a building. The officer Rogas approached them, announced his office, said stop police, and defendant took off running. The logical inference is that if officer Rogas knew defendant, defendant knew officer Rogas. And less than 24 hours after the shooting, he sees a police officer whom he knows approaching him saying stop police, and he flees. He takes off running. This is certainly circumstantial evidence of his guilt. Ultimately, the trial court found that it had, quote, no doubt in its mind, and it was, quote, absolutely convinced that this defendant committed this offense. This finding was not so improbable or unsatisfactory as to create reasonable doubt to defendant's guilt. And therefore, the people respectfully request that this court uphold the decision of the trial court and affirm defendant's conviction for aggravated discharge of a firearm. Thank you. Thank you, counsel. In preparing for this, I thought there was no way it would ever take up all my time. So I apologize for that. There are just two things I wanted to respond to on rebuttal, and the first is this question of flight, which the state has brought up in their brief and inherent argument. And the critical point that's missing from this is that for a court to infer consciousness of guilt from flight, there has to be some factor for the defendant to believe that he's being suspected of a crime, and there's simply nothing in this case. What authority do you have for that statement? That statement comes out of the People v. Lewis, Illinois Supreme Court case. The inference of guilt which may be drawn from flight depends upon the knowledge of the suspect that the offense has been committed and that he or she may be suspected. So he has to be aware that he's being suspected of committing a crime. And, again, respectfully, in this case, we have no linkage beyond the suspect testimony as provided by Padilla and by Fox that the defendant was in any way involved in this offense. There's no credible eyewitness on the scene that places the defendant at the scene. And so for the court to be inferring consciousness of guilt from his flight from a police officer who knows him because he's there arresting him all the time, that to me in the arrest they give contact cards, and I think there was one, I believe the officer indicated he had done an arrest of the defendant once previously. Simply flight alone is not enough to link it back to this shooting that allegedly occurred in the park the night before. Maybe flight alone, but how about with all the other circumstances? Respectfully, the flight cases often are dealing with when you're running away at the time, like when you're seen running minutes after the offense. The offense occurred at a certain intersection, and you're seen running a few blocks away. That's a situation where, and particularly when the police are there investigating and you're running from the police within sort of that contemporaneous moment of the offense. In this situation, again, if there had been any indication that the defendant was aware the police were looking for him in relation to the shooting and that he ran, great. Then we can be making that inference. But we just don't have that extra piece. We don't have that piece of knowledge that the police were there on this alleged shooting to allow this court to reach that inference. And the individual's knowledge. No, the shooting happened in the neighborhood. The police have been talking to people that know the defendant, and then this police officer approaches the defendant and he takes off. Right. Why did he take off? I can think of any number of reasons why a young African-American male in the south or on the west side, northwest side, would run from the police. We know that from case law. We know that from social science. We know that this happens all the time. And to correct... Well, aren't you asking us to ignore a lot of things? I mean, you're asking us to ignore that he fled from a police officer that he knew in an area where there had recently been a shooting. You're asking us to ignore the shell casings. You're asking us to ignore a 14-year-old witness that the judge declared to be highly credible. Aren't you asking us to ignore an awful lot of things that get around this judge? I'm asking you to look at every single same thing that that judge looked at. And I'm asking you to determine whether or not those conclusions the court reached were reasonable. From just the gut reaction upon reading this record, from working on this case,  and I believe that these conclusions that were being reached by the court in this case were unreasonable. And that's what I'm asking this court to do, to look at the exact same evidence, not to ignore any piece of it, but to look at it and decide, was this evidence sufficient to connect our client to the offense of aggravated discharging of a firearm? Did our client direct the fire gun in the direction of this van? Where is the fiscal evidence to connect that? Where is the damage to the van? There are problems that we have in this case. Well, you seem to want to point to the damage to the van. But people who are not familiar with the firing of guns, and they fire a gun, they could aim it, you know, and the impact of the gun, we could take judicial notice, the gun will go like that, unless you know what you're doing with the gun. That's why every time you open up a newspaper, you see that somebody who was near a scene, some child is killed. I don't know that these people are aiming at these children, but they don't know how to fire the gun, so that's what happens. So the fact that he's aiming somewhere and he's not a good shot is not necessarily evidence. It may be that he doesn't know how to operate the gun in a proper manner. Well, then we have a one-way street with cars parked on both sides of that street, and we have houses on one side of the street and houses across the intersection, and the police found no physical damage to any of those areas. Sometimes the gun goes like that. That argument ignores the fact that the shell cases were fired. I mean, you can't argue that there were no bullets if there's four shell cases. That argument just doesn't follow. We still need to remember if, for this offense, you have to fire the gun in the direction of something, and if shots are being fired up in the air, then we might have a reckless discharge. If we simply have pointing a gun and then shooting at the ground, we might have aggravated assault, but we don't have an aggravated discharge of a firearm. But, frankly, we simply don't have that positive, credible testimony with which we believe this court should affirm what the trial court found in this case. I understand that there was physical evidence recovered, but there needs to be physical evidence recovered that directly connects back to the offense that's being charged. And here, in this case, we respectfully believe that that's. . . Could you remind me where the shell cases were found? They were found near the corner, I believe in the street, and they were sort of within a few feet of each other. But there was no photographs taken of them. The recovering officer picked them up and inventoried them that night, and so we don't have, again, that piece that we always look to in terms of just trying to find that corroborative, detailed physical evidence of where the casings were found. And, again, we know that the stipulation showed that the casings came from the same gun, but we have no gun in this case. We have no thing connecting back to Mr. De Gea, and that's the problem that we have. A shooting may have occurred, but we need that shooting to actually be linked positively and credibly to who the defendant is in this case, and that's what's lacking here. For these reasons, we ask this Court to reverse the trial court's determination and reverse the conviction for aggravated discharge of a firearm. Thank you, Your Honor. Thank you, guys, for giving us a very interesting case, and we'll take it under advisement. We'll take a short recess.